IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LUIS E. GARCIA CAMPOS                                                           PLAINTIFF

v.                          Civil No. 07-5I61

DEPUTY FREE; DEPUTY
THOMPSON; DEPUTY DAY;
CAPTAIN PETRAY                                                                  DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff, Luis E. Garcia Campos (hereinafter Campos), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in Arkansas Department of Correction. The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Benton County Detention Center. Plaintiff contends he was subjected to excessive force, discriminated against, and denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 16). To assist plaintiff in responding to the motion, a questionnaire was propounded (Doc. 21). Plaintiff filed a response to the questionnaire (Doc. 22). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

### Background

Campos was booked into the Benton County Detention Center (BCDC) on March 8, 2007, on charges of rape and residential burglary. *Plaintiff's Response* (hereinafter *Resp.*) at ¶ 1. The United States Department of Homeland Security issued an Immigration Detainer–Notice of Action

-1-

AO72A
(Rev. 8/82)

on Campos on March 8th. *Id.* at ¶ 2. On March 8th, Judge Clinger signed an order of release and stipulated bond providing that Campos could be released after posting bond of $75,000. *Id.* at ¶ 3.

On March 29th, Campos submitted a medical request. *Resp.* at ¶ 6. He stated he needed cream for his feet because they were dry and cracking. *Id.* In response, he was seen by the nurse on April 2nd, diagnosed with dry feet, and given hydrocortisone cream. *Id.* at ¶ 7.

On April 2nd, Campos submitted a request asking if he and Inmate Landa could be housed in the same cell. *Resp.* at ¶ 8(A). He stated that he didn't speak very "good" English and his cellmates were white. *Id.* In response he was told that he would stay as housed and they made the decision where inmates were housed. *Id.* at ¶ 8(B).

On April 13th, Campos submitted a medical request stating he felt like he was getting sick. *Resp.* at ¶ 9(A). He said his nose was dry inside and after he cleaned it his nose started bleeding. *Id.* He said maybe he was getting a cold or something. *Id.* He was seen by the nurse on April 20th for a cold. *Id.* at ¶ 9(B).

On April 19th, Campos submitted a request asking about when he would be able to move to general population. *Resp.* at ¶ 10. He indicated he did not like being in the lock down cells. *Id.* In response he was told he would be moved when there was availability. *Id.* at ¶ 11.

On April 25th, Campos submitted a medical request. *Resp.* at ¶ 12(A). He stated he had seen the nurse on the 19th and was supposed to get some medicine because he had a cold and nose congestion. *Id.* He said he was still sick and didn't get anything to help. *Id.* He asked to see the nurse again. *Id.* He was seen by the nurse on April 26th for sinus problems, allergies, and pain

upon urination. *Id.* at ¶ 12(B). He was given Benadryl and Cipor. *Id.* He received the prescribed medication. *Id.* at ¶ 12(C).

On April 27th, Campos submitted a grievance asking how long he had to wait before he was moved to population. *Resp.* at ¶ 13(A). In response, Captain Petray stated Campos would stay where he was at for now. *Id.*

On May 2nd, Campos submitted a medical request asking to see the doctor. *Resp.* at ¶ 14(A). He said he still had a headache and needed his eyes checked. *Id.* He indicated they kept getting redder. *Id.* He was seen by the nurse on May 7th and prescribed natural tears. *Id.* at ¶ 14(B). He received the prescribed medication. *Id.* at ¶ 14(C).

On May 8th, Campos asked to see the doctor to take care of a nail on his foot. *Resp.* at ¶ 16(A). He was seen by the doctor on May 9th and prescribed anti-fungal cream. *Id.* at ¶ 16(B). He received the medication. *Id.* at ¶ 16(C).

On May 13th, Campos submitted a medical request stating he had smashed his fingers with the door of his cell. *Resp.* at ¶ 17(A). He stated he needed something for the pain and to have his fingers checked. *Id.* He was examined on May 17th by the nurse. *Id.* at ¶ 17(B). It was noted that the middle two fingers on his right hand were bruised but there were no deformities. *Id.* Although there were no deformities, Campos states they were swollen and there was "blood inside." *Id.* He was prescribed 1000 mg. of Tylenol every 6 hours as needed for seven days. *Id.*
He received the medication. *Id.* at ¶ 17(C).

On May 22nd, Campos asked that his blood sugar be checked because it seemed like it was low. *Resp.* at ¶ 18(A). He also asked if he could get more medication because his finger still hurt.

AO72A
(Rev. 8/82)

y

*Id.* In response, the Nurse Garrett wrote that his medication had been ordered. *Id.* at ¶ 18(B). He received the medication and his blood sugar level was checked. *Id.* at ¶ 18(C) & ¶ 18(D).

On May 29th, Campos submitted a grievance. *Resp.* at ¶ 19(A). He indicated he had submitted a grievance on the 13th about not getting any help from the guards the day he smashed his fingers. *Id.* He stated he had not received the grievance back and needed it for his attorney. *Id.*

In response, Captain Petray stated that the doctor makes medical decisions in the jail. *Resp.* at ¶ 19(B). If Campos had a medical problem, Captain Petray said he needed to put in a medical. *Id.* Campos maintains the problem was the officers' actions in light of the circumstances. *Id.* He asserts that he should have been provided with necessary medical assistance within twenty-four hours. *Id.*

In particular, Campos contends Deputy Free should have gotten him help. *Resp.* at ¶ 61. Campos indicates he explained to her what happened to him and showed her his fingers "how bad they was and the physical harm." *Id.* He asserts she then just stood looking at him and said she wasn't going to call anyone for him. *Id.* He believes that if he "wasn't brown" she might have called someone to help. *Id.*

On May 29th, Campos submitted a medical request asking that his blood sugar level be checked. *Resp.* at ¶ 20(A). He also asked that he get some complete nutrition. *Id.* He stated that he had lost a lot of weight. *Id.* He was seen by Nurse Garrett on June 1st. *Id.* at ¶ 20(B). She noted he complained of being tired. *Id.* She prescribed vitamins with iron. *Id.* He received the vitamins and his blood sugar level was checked. *Id.* at ¶ 20(C) & ¶ 20(D).

On June 8th, Campos submitted a medical request in which he stated he had just been moved to D-149 cell 233 and was not getting his medication. *Resp.* at ¶ 21(A). In response, he was told his med sheets were in D pod. *Id.* at ¶ 21(B).

On June 19th, Campos submitted a request to see the nurse for a cold. *Resp.* at ¶ 22(A). He was seen by Nurse Garrett on the 21st and prescribed Keflex and Tylenol. *Id.* at ¶ 22(B). He received the prescribed medication. *Id.* at ¶ 22(C).

On June 28th, Campos submitted a grievance stating that he was using the phone and four minutes later Deputy Akins turned the phones off. *Resp.* at ¶ 23(A). He stated he went to the front to ask why Akins had turned off the phones when Campos was using it. *Id.* Campos said Akins indicated Campos was not supposed to be using the phone after he ate. *Id.* Campos then asked why Akins didn't say something before he turned it off. *Id.* Campos indicated he asked for a request and was refused one. *Id.* Campos indicated Deputy Bryson then yelled at him for arguing with a deputy. *Id.* In response, Captain Petray indicated he checked Campos' phone records and they did not reflect that this occurred. *Id.* at ¶ 23(B).

On June 28th, Campos submitted a medical request stating that he had been getting medicine for his cold but the medicine was gone now and he was still sick. *Resp.* at ¶ 24(A). He stated he also needed something for his headaches. *Id.* He was seen by Nurse Garrett on June 29th. *Id.* at ¶ 24(B). She noted Campos had a sore throat and felt tired. *Id.* She scheduled him to see the doctor. *Id.* On July 2nd Campos did not show up for his doctor's appointment. *Id.* at ¶ 24(C). Campos indicates he was unable to go. *Id.* at ¶ 24(D).

On July 6th, Campos submitted a medical request stating that he had been on medicine for a cold but was still sick. *Resp.* at ¶ 25(A). He stated that he was also having headaches and

wanted to make sure he got something for that. *Id.* He indicated the nurse had given him something that day for a headache. *Id.* He was seen by the Nurse Garrett on July 11th and prescribed Tylenol for a headache. *Id.* at ¶ 25(B).

On July 9th, Campos submitted a grievance stating that his cell-mate was on lock-down so he had to give his bed away. *Resp.* at ¶ 26(A). He stated for the past two days he did not get his bed for nap time. *Id.* In response, Captain Petray stated he would check on this for Campos. *Id.* at ¶ 26(B).

On July 16th, Campos submitted a medical request. *Resp.* at ¶ 27(A). He stated he felt really sick because of his cold. *Id.* He was seen by the nurse that day. *Id.* at ¶ 27(B). He received a shot of antibiotic. *Id.* at ¶ 27(C).

At approximately 8:00 p.m. on July 17th, Deputy Thompson was in D-pod to help lock down the pod. *Resp.* at ¶ 29. According to defendants, the inmates were not going to their cells and Deputy Arhangelsky called in D-149 several times for the inmates to lock down. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 4 at page 1. Deputy Thompson, Deputy Day, and Deputy Wales entered D-149 to help the inmates to their cells. *Id.* Defendants maintain Campos told them he would go to his cell in a minute. *Id.* Defendants assert Thompson states he grabbed Campos' right hand to escort him to his cell. *Id.* Campos fell to the floor. *Id.* Thompson and Day helped Campos to his feet and escorted him to his cell. *Id.* According to Day, the following then occurred:

> Campos was arguing with Deputy Thompson. Deputy Thompson told him to go to the back of his cell. The inmate was still not complying with the deputy's orders. Deputy Thompson told Inmate Garcia Campos to get on his knees until we left the cell. The inmate stated above, still would not comply, so Deputy Thompson gave him a common peroneal strike to this thigh to get him on his knees

> at this time he complied and we exited the cell with no incident. A few minutes later the inmate called down to pod control wanting to talk to the Lieutenant and I told him he was not here at the time. The inmate stated above, called again and asked to speak to the Lieutenant. I told him again he was not here. Inmate Garcia Campos pushed the button again, so I went to his cell and gave him a request form and told him to fill out the form to see the Lieutenant in the morning. I continued my duties with no further incidents.

*Defts' Ex.* 4 at page 2.

According to Campos, he stated he was going but could not go fast because he had just been given a shot by the nurse. *Resp.* at ¶ 31(B). Campos states he was not escorted he was beaten and hit to get on the floor. *Id.* at ¶ 31(C) & ¶ 31(D). Campos asserts he never refused to comply with their orders. *Id.* at ¶ 32(C). He maintains he didn't have time to comply. *Id.*

When he pushed the button and asked to talk to the lieutenant, Campos states Day told him if he pushed the button again he would be locked down. *Resp.* at ¶ 32(E). Campos indicates he did push the button a second time but it was to ask to speak to Captain Petray and to ask for medical attention. *Id.* at ¶ 32(F). Campos denies that he pushed the button a third time. *Id.* at ¶ 32(G).

Campos indicates Day came to his cell, grabbed him by his left arm and the back of his neck, and beat his face into the wall two times. *Resp.* at ¶ 32(G) - ¶ 32(I). Campos maintains Day took these actions simply because he was requesting medical attention. *Id.*

On July 17th, Campos submitted a grievance. *Resp.* at ¶ 28(A). He stated for no reason as he was going to his cell Deputy Thompson pushed him to the floor, bent his arm, kicked him several times, smashed his head and body, and cracked his nail. *Id.* Campos stated another deputy, Deputy Day, then helped picked him up and drove him to his cell, pushed him to the walls and

started kicking his leg and bent his leg.  *Id.*  Campos stated something was wrong with his leg now.  *Id. &* ¶ 28(B).  In response, Captain Petray stated he would check into it.  *Id.* at ¶ 28(C).

On July 18th, Campos was again prescribed vitamins with iron.  *Resp.* at ¶ 33.  On July 20th he submitted a request for a refill on his vitamins.  *Id.* at ¶ 34.  In response he was told he received enough vitamins in his food.  *Id.*

On July 30th, Campos submitted a request to see the nurse to check his hand where he had smashed his nails.  *Resp.* at ¶ 35(A).  He stated the new nail was coming in and it hurt.  *Id.*  He also stated he needed his leg checked.  *Id.*  He was seen by the Nurse who noted that he had pain in the fingers that had been smashed and his old nails were coming off.  *Id.* at ¶ 35(B).  She noted he wanted vitamins.  *Id.*  She prescribed Ibuprofen.  *Id.*  Campos received the Ibuprofen.  *Id.* at ¶ 35(C).

On August 10th, Campos submitted a medical request to see the doctor because of pain in his knee every time he walked.  *Resp.* at ¶ 36(A).  He was seen on August 13th and prescribed warm salt water rinses at bedtime and Ibuprofen, 200 mg., two tablets, every twelve hours as needed.  *Id.* at ¶ 36(B).  He received the prescribed medication.  *Id.* at ¶ 36(C).

On August 24th, Campos submitted a medical request complaining about black spots on his arms.  *Resp.* at ¶ 37(A).  He was seen on the 24th and treated for a rash.  *Id.* at ¶ 37(B).

On August 28th, Campos submitted a request because he had a cold again.  *Resp.* at ¶ 38(A).  He asked if he could get vitamins or a shot so he didn't get sick so often.  *Id.*  He was seen by the nurse on August 29th and prescribed Benadryl and Cephalexin.  *Id.* at ¶ 38(B).  He received the medication.  *Id.* at ¶ 38(C).

AO72A
(Rev. 8/82)

On September 5th, Campos asked to see the dentist because he had something between his front teeth on the back side. *Resp.* at ¶ 40(A). He said it was small and now was bigger and it hurt. *Id.* He was seen on September 7th and salt water rinses were prescribed. *Id.* at ¶ 40(B).

On September 22nd, Campos requested some cream for his feet and something for headaches. *Resp.* at ¶ 42(A). He was seen on September 24th. *Id.* at ¶ 42(B). It was determined no treatment was needed for his feet. *Id.* He was prescribed Ibuprofen every six hours as needed for five days for his headaches. *Id.*

On October 8th, Campos submitted a request because he had bad headaches again. *Resp.* at ¶ 43(A). He also stated he wanted to see a dentist because he had some stuff on his front teeth and didn't want to lose his teeth. *Id.* He was seen on October 10th by the nurse and prescribed Motrin three times a day for his headache. *Id.* at ¶ 43(B). He received the Motrin. *Id.* at ¶ 43(C).

The records do not indicate if he was given anything for his teeth or put on a list to see the dentist. Campos was asked what, if anything, was done in response to his October 8th request for treatment for his teeth and he didn't respond. *See Resp.* at ¶ 43(D).

On October 8th, Campos submitted a grievance asking what happened to his September 29th grievance he submitted complaining about one of the guards answering another inmate by the name of Phillips in a offensive, disrespectful, and harassing manner. *Resp.* at ¶ 45(A). In response, Captain Petray said he had answered Campos' grievance. *Id.* The referred to grievance is a September 29th grievance in which Campos states he would like to press charges against Jailer Strickland for terroristic threatening. *Id.* at ¶ 45(B). Captain Petray responded that he had talked to Strickland about the incident and it did not constitute terroristic threatening. *Id.* at ¶ 45(C).

On October 10th, Campos submitted a grievance saying he had dust in front of his teeth causing him pain. *Resp.* at ¶ 46(A). Campos said he asked the doctor if he could have it removed and the doctor replied when he got out. *Id.* Campos indicated he was going to do a couple of months and had been told that he got dental service if he needed it. *Id.* He asked if he could talk to a dentist. *Id.* In response, Captain Petray stated he would forward Campos' request to medical. *Id.* at ¶ 46(B). Captain Petray stated the doctor made the medical decisions at the jail. *Id.*

On October 13th, Campos submitted a request for a refill on his Motrin. *Resp.* at ¶ 47(A). He was seen by the nurse on October 15th and given Motrin. *Id.* at ¶ 47(B).

On October 19th, Campos submitted a grievance stating he had received back his September 29th grievance that day. *Resp.* at ¶ 48(A). He indicated he had been told that Strickland's saying that he was going to kill someone was not terroristic threatening. *Id.* However, he indicated if he made that statement he would have been charged. *Id.* In response, Captain Petray stated that Strickland denied making the statement to Campos. *Id.* at ¶ 48(B).

On October 22nd, Campos submitted a medical request because of cold sores. *Resp.* at ¶ 49(A). He was seen by the nurse on October 24th and prescribed saline rinses. *Id.* at ¶ 49(B). He received the saline rinses. *Id.* at ¶ 49(C).

On November 18th, Campos submitted a medical request for something for his two cold sores. *Resp.* at ¶ 51(A). He indicated the salt water didn't do any good. *Id.* In response, he was to see the doctor. *Id.* at ¶ 51(B). He submitted another request for something for his cold sores on November 21st. *Id.* at ¶ 51(C). He was treated on November 26th and again received salt water rinses. *Id.* at ¶ 51(D).

On December 15th, Campos submitted a medical request stating he had dry feet. *Resp.* at ¶ 56(A). He said it was making him itch. *Id.* He also stated he needed something for his headaches. *Id.* He was seen on the 16th and given Benadryl for three days. *Id.* at ¶ 56(B).

On December 18th, Campos requested a refill of his headache medicine. *Resp.* at ¶ 57(A). He stated he got it twice a day but a few hours after he took the medicine the headache comes back. *Id.* In response, he was told he would see the doctor. *Id.* at ¶ 57(B).

Campos was released to the Arkansas Department of Correction on December 30th. *Resp.* at ¶ 58. All decisions regarding Campos' medical care and treatment at the BCDC were made by the jail doctor and nurses. *Id.* at ¶ 59.

### **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case

founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment. First, defendants argue no excessive physical force was used against Campos. Instead, they maintain only a reasonable amount of force was used to gain his compliance with orders. Further, they maintain no injuries were inflicted. Second, they maintain verbal threats and name calling are not constitutional violations actionable under § 1983. Furthermore, they argue there is absolutely no evidence of discrimination against Campos. Finally, they maintain there is absolutely no evidence of deliberate indifference on their part to the serious medical needs of Campos. They point out that the medical staff responded to, and treated, multiple conditions asserted by Campos to exist.

### *Discrimination*

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)(citation omitted). Only *deliberate* discrimination is actionable under the Equal Protection Clause. *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 239- 48, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). Thus, a claim of racial discrimination under the Equal Protection Clause requires a showing of discriminatory intent. *Washington*, 426 U.S. at 239-40.

Here, there is no genuine issue of fact as to whether any of the named defendants intentionally discriminated against Campos because he is Hispanic. *See e.g., Resp.* at ¶ 61. In connection with the July 17th incident, all inmates in D-149 were told to lock-down. *Defts' Ex.* 4. Campos was not singled out. *Id.* Campos states he told Deputy Thompson and Day he would

go but couldn't go fast because he had just seen the nurse and received a shot. *Resp.* at ¶ 31(B). Thompson and Day maintain Campos did not comply and argued with them. *Defts' Ex.* 4. While there is some disagreement as to what actually occurred between Campos, Thompson, and Day, there is no indication at all that the fact that Campos is Hispanic had any impact or effect on the defendants' actions. In short, there is nothing from which an inference of discrimination can be drawn.

In connection with his requests for medical care, Campos was able to effectively communicate with the medical staff, was treated by them on multiple occasions, and received all treatment ordered by them. While Campos may think he should have received emergency treatment after he injured his fingers in the cell door, nothing, other than his conclusory allegation, suggests the lack of emergency response on Deputy Free's part was related in any way to Campos' being Hispanic. In short, there are no genuine issues of fact and defendants are entitled to summary judgment on this claim.

### *Excessive Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, defendants indicate Campos was a pretrial detainee when the alleged excessive force occurred. *Defendants' Brief* (Doc. 17) at page 2. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer,* 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, we believe there is a factual dispute that precludes summary judgment in defendants' favor on the excessive force claim. Campos maintains he was complying with the defendants' order to return to his cell but could not do so quickly as Day and Thompson would

have liked because of a shot he had just received. *Resp.* at ¶ 31(A). Campos maintains he was not arguing with Thompson and Day and was attempting to comply with their orders. *Id.* at ¶ 31(A)-¶ 31(D). Despite this, Campos maintains he was struck to the floor by Thompson. *Id.* at ¶ 31(D) & ¶ 32(C). When he requested medical care, Campos maintains Day used force against him. *Id.* at ¶ 32(H).

In contrast, Thompson and Day assert Campos was arguing with them and refusing to comply with orders. *Defts' Ex.* 4. Oddly, Thompson in his incident report does not mention that he utilized a common peroneal strike to Campos' thigh to get him to comply. *Id.* at page 1. This fact is reported by Day. *Id.* at page 2.

We are not free at the summary judgment stage to believe one version of the events over the other. If the events occurred as Campos suggests, there may well be a basis for finding the defendants employed excessive physical force against him. However, if the events occurred as defendants' maintain, the use of force was undoubtedly reasonable under the circumstances.

### *Denial of Adequate Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center

officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

In this case, Campos received all medical care and treatment prescribed him by the jail doctor and nurse. All decisions regarding his medical care and treatment were made by the jail nurse and doctor. *Resp.* at ¶ 59.

Campos has not named the medical staff as defendants in this case. Instead, he names as defendants Free, Thompson, Day, and Captain Petray. Campos asserts these defendants were responsible for a delay in his obtaining medical care.

"[A]n inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995). *See also Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(when inmate alleges that delay in treatment rise to level of Eighth Amendment violation, objective seriousness of deprivation should be measured by effect of delay, and to establish this effect inmate must place verifying medical evidence in record). Here, there is no indication Campos suffered injury as a result of the delay in his receipt of medical treatment. He has submitted no medical evidence establishing the detrimental effect of the delay in his treatment of the injury to his fingers from May 13th, the date of the incident, to May 17th, the date he was seen by the nurse, *Resp.* at ¶¶ 17(A) & 17(B), or of any delay in treatment following the July 17th incident involving Thompson and Day, *Resp.* at ¶¶ 28(A), ¶34 & ¶ 35(A).

Furthermore, there is no evidence the Captain Petray was personally involved in making any decisions regarding Campos' medical care. Instead, Captain Petray merely responded to grievances submitted by Campos and referred those grievances to the medical staff. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

AO72A
(Rev. 8/82)

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 16) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to the plaintiff's discrimination and denial of medical care claims. I further recommend that the motion be denied with respect to plaintiff's excessive force claims against Deputy Day and Deputy Thompson. This would dismiss all claims against Captain Petray and Deputy Free.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of January 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE